OPINION
{¶ 1} Defendant-Appellant, Rebecca Shrode, et al., appeals the judgment of the Hancock County Court of Common Pleas dismissing her counterclaim for negligent workmanship and breach of contract against Plaintiff-Appellant, Gibson Concrete Construction, Ltd. On appeal, Shrode asserts that the trial court's judgment was against the manifest weight of the evidence. Specifically, Shrode asserts that the weight of the evidence demonstrates that Gibson Concrete Construction did not perform in a workmanlike manner and exercise ordinary care and skill, and that she did not fail to mitigate damages. Based on the following, we affirm the judgment of the trial court.
 {¶ 2} The case before us arose from the following sequence of events. In 2004, Shrode was in the process of building a new home and was acting as her own contractor. She entered into a contract with Gibson Concrete Construction ("GCC") to perform the concrete work in the home, including pouring of a basement floor. At some point, Shrode elected to install a radiant heating system designed by Radiantec within the concrete floor. A radiant heating system is a system of polymer tubing installed within a floor, through which heated water passes to supply heat to the room above it. Shrode hired John Steen, a plumber, to install the heating system. During completion of the concrete floor, Clinton *Page 3 
Gibson, a GCC employee, cut a polymer tube with a floor saw. The following action ensued.
 {¶ 3} In April 2005, GCC filed a complaint against Shrode, the Hancock County Treasurer, Wells Fargo Bank, Delbert P. Dehnhoff, and John Steen.[1] The complaint alleged, in part, that GCC completed the work contracted for in December 2004; that Shrode failed to pay for certain work and materials valued at $6,200; and, that, in January 2005, it filed an affidavit for a mechanic's lien with the Hancock County Recorder's Office. GCC's complaint requested: (1) an order that its lien on Shrode's property was valid and for the lien to be foreclosed, (2) judgment against Shrode in the amount of $6,200, and (3) reasonable attorney's fees, interest, and costs.
 {¶ 4} In June 2005, Shrode filed an answer to GCC's complaint, claiming, in part, that it did not complete the contracted work in a workmanlike manner. Additionally, Shrode filed a counterclaim alleging breach of contract, breach of warranty, negligence, and violations of the Ohio Consumer Sales Practice Act. Shrode alleged that GCC's faulty workmanship in installing the concrete damaged the radiant heating system and that her cost of repair was $13,186.24. As relief, *Page 4 
Shrode requested: (1) damages for cost of repair in the amount of $13,186.24, (2) incidental and consequential damages, (3) actual damages, triple damages, and attorney's fees for violation of the Ohio Consumer Sales Practice Act, and (4) costs and interest.
 {¶ 5} In July 2006, the case proceeded to a hearing before a magistrate, at which the following testimony was heard.
 {¶ 6} Clinton Gibson ("Clinton") testified that he is a manager of GCC and has been an employee for ten years; that his father, Albert Gibson, owns GCC; that GCC entered into a contract with Shrode for concrete work in a new home, including installation of a basement floor; that the contract specified that the floor would be four inches thick with saw control joints, which is within the industry standard; that a saw control joint is a cut made with a saw that prevents a concrete floor from cracking; that saw control joints are typically one-quarter of the thickness of the concrete; that, accordingly, Shrode's four inch thick floor required a minimum one inch saw control joint; and, that he reviewed the specifications of the project with Shrode, specifically informing her that the floor would be four inches thick.
 {¶ 7} Clinton continued that, after they entered into the contract, Shrode informed him that she intended to install a radiant heating system designed by Radiantec within the basement floor; that GCC did not contract to install the *Page 5 
heating system, but John Steen, a plumber, contracted for this part of the project; that neither Shrode nor Steen gave him any information from Radiantec about the heating system; that Steen did not provide him with any instructions as to any modification of his job specifications for pouring of the floor; that he was not supplied with any specifications as to the heating system or new blueprints; that the only modification to the project that Shrode requested in light of the heating system was that GCC install wire mesh as part of the floor in place of rebar, which he typically used; that the wire mesh was required so that the polymer tubing for the heating system could be tied to something; that the tubing is tied to the wire mesh to prevent it from floating upward while the concrete is poured; that the heating system did not require a change in the thickness of the floor, but that he discussed pouring a thicker floor with Shrode "for extra insurance as far as depth or clearance between the top of the floor and the tubing" so that, during the saw cut, the tubing would be further down in the floor" (hearing tr., p. 34); and, that, had Shrode requested a thicker floor, he would have issued a written "change order," because this would increase the cost of the project.
 {¶ 8} Clinton then described the process of installing the floor. Clinton explained that, after GCC laid the wire mesh, Steen laid the tubing in a pattern; that he watched Steen lay the tubing, but no employees of GCC were involved in this process; that Steen tied the tubing to the wire mesh with plastic "zip ties" as *Page 6 
he laid it; that zip ties are very strong and do not break easily; that, after laying the tubing the first time, Steen and his crew realized that the spacing was off, removed 90 percent of the zip ties, and respaced the tubing; that, when Steen finished, GCC commenced pouring the concrete; that the GCC crew used a hook to lift the wire mesh to suspend it into the bottom third of the concrete floor; that he lifted the wire mesh to an appropriate point during the pour, approximately three-quarters of an inch from the bottom; and, that it is important to lift wire mesh or rebar to suspend it within the concrete, otherwise it will not reinforce the concrete.
 {¶ 9} Clinton continued that, prior to saw cutting the floor, neither Shrode nor anyone else requested him to make the saw control joint cut at one-half inch instead of one inch to avoid nicking the tubing; that he had a discussion with Shrode and Steen prior to cutting the floor, during which he told them the saw cut would be one inch; that he cut the saw control joints into the floor using a floor saw at a depth of exactly one inch; that, within the first six or eight feet of cutting, he struck a tube; that, after cutting the tube, he stopped the saw and called Shrode; that Shrode directed him to call Steen; that Steen told him to cut an eight-by-eight inch square out of the floor so he could repair the tubing in that area; that, with Shrode's consent, he cut out the piece Steen directed him to; that, after he struck the tube and removed the eight-by-eight inch section, Shrode requested him to raise the depth of the saw cut to one-half inch for the remainder of the floor; that a *Page 7 
saw control joint would not serve its purpose unless it was one-quarter the floor depth; and, that he saw cut the remainder of the floor at a one inch depth, because the floor would have been compromised if he did not cut it and, if the tubing was properly attached to the wire mesh, he should have had three inches of clearance to make the cut.
 {¶ 10} Clinton continued that, from examining the eight-by-eight inch section he removed at Steen's request, he observed that the tubing was not fastened to the wire mesh and was "floating"; that the tubing was three-quarters of an inch from the top of the concrete; that the wire mesh was three-quarters of an inch from the bottom of the concrete; that he believes the only way the tubing could have floated so close to the top was if it was not tied down to the wire mesh in a proper fashion; that he would not have been able to observe the tube floating while the pour was being made; that, even after he explained this to Shrode, she withheld $6,200 payment on the contract for all of the concrete work from GCC, including the basement floor; and, that the price of the floor was approximately $3,500 to $3,600.
 {¶ 11} Albert Gibson ("Albert") testified that he is a concrete mason and owns GCC; that he has been in the concrete trade for thirty-nine years and is familiar with local concrete industry standards; that his son, Clinton, works for the business; that GCC entered into a contract for concrete services with Shrode; that *Page 8 
the contract provided for a four inch thick concrete floor with saw cut control joints; that, after GCC entered into the contract with Shrode, she informed him that she intended to install a radiant heating system within the floor; that GCC does not provide that service; and, that neither Shrode nor Steen provided him with any instructions, manuals, or blueprints regarding the radiant heating system.
 {¶ 12} Albert continued that saw cutting control joints into concrete basement floors is within the local custom of the concrete community; that the industry standard for the depth of a saw cut is one-quarter of the thickness of the floor; that a saw cut any less than this amount would serve no purpose, because cracking would occur; that, if a homeowner requested he not make the saw cuts, he would require her to sign a written change order or waiver relieving him of responsibility for all the cracks that would occur in the floor; and, that Shrode never told him that she did not want the floor to be saw cut.
 {¶ 13} Albert further testified that, after the tubing was cut, Clinton showed him the eight-by-eight inch piece he had cut out of the floor at Steen's direction; that the piece clearly showed that the tubing had floated to the top of the concrete and was not attached to the wire mesh, which was at the bottom of the concrete; that Steen directed GCC to remove a four foot long portion of the floor so that he could make the necessary repairs; that, in the four foot long piece GCC removed, it was plain that the tubing was tied to the wire mesh on either end, but not in the *Page 9 
middle, which is why it floated to the top; that it was not GCC's job to inspect the tubing to make sure the ties were proper; and, that the work performed by GCC met the standard of the local concrete industry.
 {¶ 14} Shrode testified that her original contract with GCC provided that changes could be made to the contract if a written change order was agreed upon by the parties; that the initial project estimate specified a four inch concrete basement floor; that no written change orders existed that deviated the depth of the concrete; that the contract twice provided for saw control joints; that GCC was aware that she planned to install a radiant heating system in the floor before they entered into the contract; that she hired Steen to install the heating system; that she gave GCC's specifications to Steen; that she does not know if she gave any information about the heating system directly to GCC; that only Steen and his crew installed the heating system; that she visually inspected the installation of the heating system after Steen completed it; that she did not tell GCC not to saw cut the floor; that Clinton cut out a piece of concrete block after the tube was cut, and gave her half, but that she threw her half away; that he showed her his piece and explained to her that he believed the tube had floated from the wire mesh; that she decided to remove the entire floor because Steen told her that the saw cut could create more problems and repair would not be feasible; and, that she withheld $6,200 from the contract with GCC. *Page 10 
 {¶ 15} Shrode further testified that she obtained a $7,100 insurance settlement from Steen for the damage to the heating system, but that it did not cover all of her expenses; that her total expenses were $19,734; that, when the entire floor was removed at her direction, she observed that the location of the tubing within the cement varied from extreme highs to extreme lows; and, that she and Clinton agreed that she would withhold $6,200 until the matter of the tube cutting was resolved.
 {¶ 16} Cliff Wheeler testified that he contracted with Shrode to act as her consultant in building a new home; that, upon being informed that the tubing had been cut, he proceeded to the site and discovered that Clinton had continued saw cutting the floor; that he told Shrode this was problematic because there may have been more cuts in the tubing; that he is not an expert in installing or repairing damaged radiant heating systems; that, when he examined the floor after it was removed, some of the tubing was only one-half inch or three-quarters of an inch from the surface of the concrete; and, that the piece GCC removed from the floor at Steen's direction reflects that the tubing came loose from the wire mesh and floated.
 {¶ 17} John Steen testified that Shrode hired him as a plumber to install the radiant heating system; that this was the first radiant heating system he installed; that Shrode provided him with instructions on how to install the floor from *Page 11 
Radiantec; that, as he and his crew installed the tubing, they tied it down with plastic zip ties; that they had to tie the tubing to the wire mesh in order to keep it from moving while the concrete was poured; that, if the ties are not placed every twelve to eighteen inches, the tubing can float; that he placed ties anywhere from twelve to eighteen inches; that he or his son personally inspected every tie that was made; that GCC had the opportunity to check the ties; that, in the piece of concrete GCC removed from the floor, the tubing appears separated from the wire mesh by several inches; that he has "no idea" how the tubing separated and moved so close to the surface; that installation of the heating system was not part of GCC's job; that GCC was not his supervisor; that GCC's separate job was to pour the concrete; that, after the tubing was cut, Shrode told him that she did not want a repair, but wanted to replace the entire floor; that he never advised Shrode that repairing the heating system would not be feasible, but told her that is was possible; and, that Shrode filed a claim against his insurance company, which paid her $7,178.08.
 {¶ 18} In August 2006, the magistrate issued her decision, finding the following facts: that the standard practice for GCC and the Hancock County area is to make a saw control joint at a depth of one-quarter of the thickness of the concrete; that the saw cut is for aesthetic purposes as well as to maintain the strength of the floor by preventing cracking; that the parties contracted for a four *Page 12 
inch thick concrete floor; that Shrode hired Steen to install the heating system; that Steen did not give GCC any specific information or indication that the heating system required any particular method of pouring the concrete; that GCC discussed making the floor thicker to allow more clearance for the saw control cut, but Shrode opted not to make the change because of the cost; that Steen was responsible for the installation of the heating system; that no one from GCC undertook to inspect Steen's work; that GCC poured the concrete, lifting the wire mesh during the pour to strengthen the concrete; that GCC informed Steen and Shrode that the saw cut would be one inch deep on the four inch thick floor; that GCC struck a tube while making the saw cut; that, at Steen's direction, GCC removed an eight-by-eight inch piece of the floor for access for repairs; that, upon inspecting the piece, GCC and Wheeler concluded that the tubing came loose from the wire mesh; that, at Steen's direction, GCC removed an additional four foot long piece from the floor, after which, they observed that the tubing was not tied down anywhere along that four foot section; that, from the exhibits, it is apparent that the wire mesh was five-eighths of an inch from the bottom of the section, and the tubing was three-quarters of an inch from the floor surface, separated from the wire mesh by two inches; that, had the saw cut been reduced to one-half inch, it would not have the intended effect of preventing cracking; that GCC would have required a change order form in order to eliminate the saw cut or to not lift the *Page 13 
wire mesh into the concrete; that, although Shrode testified that she decided to remove and replace the entire floor based upon Steen's statements that a repair was not feasible as well as her own research, Steen testified that he told Shrode a repair was possible; and, that a concrete patch would be appropriate cosmetically.
 {¶ 19} The magistrate then concluded that GCC had no reason to know that the radiant heating system, installed by Steen, would have any effect on the method of pouring and cutting the concrete in accordance with the contract specifications; that, based on the dimensions of the tubing, tie down requirements, and the depth of the saw cut, there should have been no contact between the saw blade and the tubing; that Steen, and not GCC, had all of the instructions related to the heating system, which were not shared with GCC; that observation of the exhibits, as well as the testimony, establish that the tubing separated from the wire mesh; that the tying down of the tubing was performed by Steen and his crew; and, that, accordingly, GCC did not contribute to any injury or perform in an unworkmanlike manner. The Magistrate further concluded that, even had GCC been negligent, Shrode failed to mitigate damages because she elected to remove the entire floor and install a new heating system even though Steen told her that a repair was possible.
 {¶ 20} Accordingly, the magistrate recommended that the trial court issue an order granting judgment in favor of GCC for $6,200; granting judgment in *Page 14 
favor of GCC on Shrode's counterclaim; and, directing costs to be paid by Shrode. Shortly thereafter, Shrode filed timely objections to the magistrate's decision.
 {¶ 21} In January 2008, the trial court overruled Shrode's objections and adopted the magistrate's decision.
 {¶ 22} It is from this judgment that Shrode appeals, presenting the following pro se assignment of error for our review.
 MAGISTRATE ERRED IN FINDING THAT GIBSON CONCRETE USED ORDINARY CARE, SKILL AND WORKMANSHIP IN INSTALLING THE CONCRETE FLOOR. THE MAGISTRATES [SIC] DECISION WEIGHED AGAINST THE MANIFEST EVIDENCE.
 {¶ 23} In her sole assignment of error, Shrode argues that the magistrate's decision was against the manifest weight of the evidence. Specifically, Shrode contends that the weight of the evidence demonstrates that GCC did not perform in a workmanlike manner and exercise ordinary care and skill, and that she did not fail to mitigate damages when evidence was presented that the entire floor could have been compromised by the saw cut. We disagree that GCC did not perform in a workmanlike manner.
 {¶ 24} Initially, we note that the parties have stipulated that $6,200 remains to be paid from Shrode to GCC under the original contract. (Hearing Tr., p. 14). Thus, the only issue remaining for this appeal is whether the trial court's rejection *Page 15 
of Shrode's counterclaim for negligent workmanship and breach of contract was proper.
 {¶ 25} Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.C E. Morris Co. v. Foley Const. Co. (1978), 54 Ohio St.2d 279, 280. "[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct." State v. Wilson, 113 Ohio St.3d 382, 387,2007-Ohio-2202, citing Seasons Coal Co., Inc. v. Cleveland (1984),10 Ohio St.3d 77, 80-81. Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment. Id.
 {¶ 26} "To prevail on a negligence claim for failure to perform in a workmanlike manner, the [proponent] must `show by a preponderance of the evidence that [the contractor] failed to exercise ordinary care and skill, and such failure proximately caused the damages.'" Floyd v.United Home Imp. Ctr., Inc. (1997), 119 Ohio App.3d 716, 719-720, quoting ML. Simmons, Inc. v. Bellman Plumbing, Inc. (1995), 8th Dist. No. 67832, 1995 WL 396349. This Court has defined "workmanlike manner" as "`a standard that requires [a contractor] to act reasonably and to exercise that degree of care which a member of the construction trade in good standing in that community would exercise under the same or similar *Page 16 
circumstances.'" Fullenkamp v. Homan, Inc., 3d Dist. No. 10-05-16,2006-Ohio-4191, ¶ 11, quoting Eberly v. Barth, 3d Dist. No. 4-03-02, 2003-Ohio-2563, ¶ 5.
 {¶ 27} Additionally, "[i]n many cases, [the proponent] must present expert testimony to prove [a contractor] deviated from the common standards of workmanship and failed to exercise ordinary care."Fullenkamp, 2006-Ohio-4191, at ¶ 12, citing Floyd,119 Ohio App.3d at 721-722. However, the proponent "need not do so when the issue is not highly technical or scientific in nature, or beyond the experience or knowledge of the average trier of fact." Id.
 {¶ 28} In the case before us, Shrode contends that the trial court's decision rejecting her counterclaim for negligent workmanship and breach of contract was against the manifest weight of the evidence because evidence was heard that Clinton told Shrode that he would reduce the depth of the saw control cut from the standard one-quarter depth of the floor; that Clinton did not reduce the depth of the saw cut and struck the tubing; that, after the tubing was cut, Shrode requested Clinton reduce the depth of the saw cut to a one-half inch depth for the remainder of the floor, but Clinton continued to saw cut the remainder at a one inch depth; that the entire floor was compromised because Clinton saw cut the entire floor at a one inch depth; and, that she mitigated damages by removing the entire floor and reinstalling it with identical materials. *Page 17 
 {¶ 29} However, testimony was also heard that a four inch thick concrete floor with a one inch saw cut was within the concrete industry standards; that a saw cut any shallower than this amount would not serve its purpose of crack prevention; that Steen was hired to install the heating system and it was not part of GCC's job to lay the tubing or to tie the tubing to the wire mesh; that GCC did not act as Steen's supervisor or participate in installing the heating system; that GCC's job was only to pour the concrete; that neither Steen nor Shrode provided GCC with any instructions as to any modification of its job specifications for pouring of the floor; that, based on the dimensions of the tubing, tie down requirements, and the depth of the saw cut, there should have been no contact between the saw blade and the tubing under the original contract specifications; that the wire mesh must be lifted to suspend it into the bottom third of the concrete, otherwise it will not reinforce the concrete; that the concrete block GCC removed from the floor shows that the wire mesh was within the bottom third of the concrete, but the tubing was not properly fastened to the wire mesh and was "floating" several inches above the it; that GCC would not have been able to observe the tube floating while concrete was being poured; and, that Shrode never told GCC that she did not want the floor to be saw cut.
 {¶ 30} We note that, although some of Shrode's testimony conflicted with GCC's testimony, "`the choice between credible witnesses and their conflicting *Page 18 
testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.'"State v. Shafer, 3d Dist. No. 6-05-15, 2006-Ohio-4189, ¶ 28, quotingState v. Awan (1986), 22 Ohio St.3d 120. Here, it is evident that the magistrate and trial court chose to believe GCC's testimony.
 {¶ 31} Shrode also specifically disputes several findings in the magistrate's decision, which the trial court adopted, including that GCC had no reason to believe the heating system would require modification in installation of the concrete floor; that a change in depth would have been evinced in a change order; that the depth of the saw control joint was a line item on the original estimate; and, that Shrode forwent the option of a thicker floor because of the increased cost.
 {¶ 32} Shrode argues that GCC was aware that a change in practice may be necessary when installing a concrete floor containing a radiant heating system because Clinton testified that he presented to her the idea of pouring a fifth inch of concrete for extra "clearance" when the saw cut was made. However, this evidence does not demonstrate that GCC had any reason to believe that the saw cut would strike the tubing, as Clinton also testified that, based on the dimensions of the tubing, tie down requirements, and the depth of the saw cut, there should have been no contact between the saw blade and the tubing under the original contract specifications. Additionally, evidence was heard that Steen did not *Page 19 
provide GCC with any instructions as to modifications of its job specifications for pouring the floor, or any manuals or blueprints for the radiant heating system.
 {¶ 33} Next, Shrode contends that she requested GCC reduce the depth of the saw control cut from one-quarter of the thickness of the floor prior to the tubing being cut. However, Clinton testified that such a cut would be too shallow to serve its purpose of crack prevention, and that neither Shrode nor anyone else requested that he reduce the depth of the saw control cut prior to the tube being cut. Additionally, Albert testified that, had Shrode requested such a modification, he would have required her to sign a written change order relieving GCC of responsibility for all the cracks that would occur in the floor.
 {¶ 34} Next, Shrode disputes the magistrate's finding that a saw control joint of 25 percent of the depth of the floor was a line item on the estimate. Although Shrode is correct that the estimate did not specify 25 percent, she has misinterpreted the magistrate's statement. The contract specifies a four inch concrete floor with a "sawed control joint." The magistrate concluded that "[t]he standard practice for [GCC] and in the Hancock County area is to make a saw control joint at a depth of 25 percent of the thickness of the concrete, and that was made a line item on the estimate." The magistrate then continued to discuss the purpose of saw control joints. We find that, although inartfully worded, the context of this finding makes clear that the magistrate was stating that the saw *Page 20 
control joint specification alone was a line item on the estimate, and not the 25 percent specification. Additionally, GCC presented testimony at the hearing demonstrating that saw control joints at a 25 percent depth were standard in the concrete industry; thus, the magistrate was within her discretion to make this conclusion.
 {¶ 35} Finally, Shrode argues that the magistrate improperly concluded that she opted not to obtain a thicker floor as discussed with Clinton due to the extra cost. However, Clinton testified that Shrode decided not to add the extra inch, and that adding the extra inch would have increased the price of the floor by 25 percent. As Shrode did not testify to any other reason for opting not to obtain the thicker floor, it was reasonable for the magistrate to conclude that Shrode decided against pouring the thicker floor due to cost.
 {¶ 36} Based on the preceding, we find the trial court's decision finding that GCC performed in a workmanlike manner and exercised ordinary care and skill to be supported by sufficient, competent, and credible evidence. Thus, the trial court did not err in dismissing Shrode's counterclaim. Additionally, as a result of our conclusion, the issue of whether Shrode failed to mitigate damages is rendered moot, and we need not address it.
 {¶ 37} Accordingly, we overrule Shrode's assignment of error. *Page 21 
 {¶ 38} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
 SHAW, P.J., and WILLAMOWSKI, J., concur.
[1] The Hancock County Treasurer, Wells Fargo Bank, and Dehnhoff were excused from the proceeding in December 2005 based upon a stipulation of lien priorities. Steen was voluntarily dismissed in February 2006. Thus, Shrode is the only remaining defendant in this appeal. *Page 1